IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Steven Roy McAlister, | ) | C/A No.: 1:12-3363-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.).  Plaintiff brought this action pro se pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards.  For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

    A.    Procedural History

On October 23, 2009, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on December 31, 2001.  Tr. at 8.  His applications were

denied initially and upon reconsideration.  Tr. at 79, 81, 83–84.  On March 23, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ivar E. Avots.  Tr. at 35–78 (Hr'g Tr.).  The ALJ issued an unfavorable decision on April 27, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 8–18.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 27, 2012.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 43 years old at the time of the hearing.  Tr. at 41.  He graduated from high school.  *Id.*  His past relevant work ("PRW") was as a stocker.  Tr. at 74.  He alleges he has been unable to work since December 31, 2001.[1]  Tr. at 8.

2.    Medical History

Plaintiff began exhibiting symptoms of depression in June 2009, shortly after his wife passed away.  Tr. at 256.  On September 15, 2009, Plaintiff was hospitalized at Oconee Memorial Hospital ("Oconee Memorial") for three days after he was found with a gun to his head.  Tr. at 227, 233–34.  On discharge, he was diagnosed with major depressive disorder with a single episode of psychotic features, generalized anxiety

---

[1] Although Plaintiff attempted to amend his onset date to June 19, 2009, and proceed with only his SSI claim (Tr. at 109–13, 216), the ALJ found it was unnecessary to amend the onset date because he found that Plaintiff had not been disabled at any time through the date of his decision.  Tr. at 8.

disorder, bereavement, possible panic disorder, and hypertension.  Tr. at 233.  During the course of his hospitalization, his mood improved, but his sometimes joyful and exuberant mood caused the treating physician to wonder whether he would carry out his suicidal plan if released on his own recognizance.  *Id.*  Consequently, Plaintiff was discharged to Patrick B. Harris Psychiatric Facility ("Harris Psychiatric") where he remained for another five days.  Tr. at 233–34, 244.  He was discharged from Harris Psychiatric on September 22, 2009, with a diagnosis of adjustment disorder with depressed mood.  Tr. at 245.  It was noted that his global assessment functioning ("GAF")[2] score was 39 on admission, but had increased to 65 by the time of his discharge.  *Id.*

On November 14, 2009, Plaintiff was admitted to Oconee Memorial for an episode of syncope that doctors noted might have been some type of seizure event.  Tr. at 260.  It was noted that his hypertension was well-controlled (*id.*), but that he was morbidly obese.  Tr. at 263.  An EKG and a CT scan of Plaintiff's head were normal.  Tr. at 264, 280–81, 284.

After being discharged from Oconee Memorial, Plaintiff presented to the AnMed Health Emergency Department ("AnMed") on November 17, 2009, complaining of abdominal pain.  Tr. at 307.  He was diagnosed with unspecified constipation.  Tr. at 309.

Plaintiff was again seen in the Oconee Memorial emergency room on December 6, 2009, after experiencing some pseudoseizure-type activity in his extremities.  Tr. at 288.

---

[2] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

His main complaint was left lower quadrant abdominal pain, and he was discharged with diagnoses of constipation and mild diverticulitis.  Tr. at 288–89.

On February 17, 2010, Plaintiff returned to AnMed complaining of back pain after tripping over a night stand and falling over a coffee table.  Tr. at 311.  Examination was negative for headache, dizziness, lightheadedness, syncope, and vertigo.  *Id.*  He was noted to have a past seizure disorder for which he was not taking medication.  Tr. at 312.  He was discharged with a diagnosis of low back pain and prescriptions for narcotic pain medication and muscle relaxants.  Tr. at 313.

Plaintiff completed a function report on June 15, 2010, in which he stated that he went to church on Sunday morning, Sunday evening, and Wednesday.  Tr. at 159.  He noted that he also went fishing and grocery shopping once a month.  *Id.*  He stated that he could walk no more than 200 feet before needing to rest and could not pay attention for longer than 30 minutes.  Tr. at 160.

On January 26, 2010, Plaintiff's treating physician, Edward H. Booker, M.D., reported that Plaintiff had diagnoses of depression, anxiety, and possible bipolar disorder.  Tr. at 303.  Dr. Booker noted that Plaintiff's symptoms included slowed thought process, suspicious thought content, flat mood/affect, and poor attention/concentration.  *Id.*  Dr. Booker opined that these impairments/symptoms caused Plaintiff to have serious work-related limitation in function.  *Id.*

On March 23, 2010, Plaintiff began receiving treatment at Rosa Clark Clinic for anxiety attacks.  Tr. at 334.  Records indicate that Plaintiff was assessed with "[p]anic disorder versus seizure," and was prescribed Effexor and Ativan.  Tr. at 334–35.

4

On April 26, 2010, Plaintiff was transported to Oconee Medical Center for an unintended overdose of Ativan.  Tr. at 396.  Plaintiff later stated, "I just wanted to calm down and fall asleep; I do not want to kill myself."  *Id.*  He was discharged home the same day.  Tr. at 397.

On May 25, 2010, psychologist Robin Moody, Ph.D., performed a consultative examination of Plaintiff.  Tr. at 337–40.  Plaintiff reported numerous symptoms of depression and anxiety, including "depressed mood, fatigue, hopelessness/helplessness, appetite changes, sleep disturbances, suicidal ideations and withdrawal . . . constant worry, nervousness, restlessness, fatigue, irritability, difficulty concentrating and sleep disturbances."  Tr. at 337.  Plaintiff reported that he spent most of his day in bed, but could drive, do household chores, cook, and groom himself.  *Id.*  He stated that he had been sexually abused at the age of eight or nine years old.  Tr. at 338.  Dr. Moody examined Plaintiff and noted that his affect was normal even though his mood was slightly depressed, his thought processes were appropriate, his attitude was cooperative, and his memory was intact.  *Id.*  She noted that Plaintiff answered questions to the best of his ability and did not appear to be embellishing symptoms or malingering.  *Id.*  Dr. Moody noted that Plaintiff had difficulty with delayed recall, serial 7s, and spelling the word "world" backwards.  *Id.*  Dr. Moody assessed Plaintiff as having "moderate difficulty maintaining social relationships due to his isolation and depression."  *Id.* However, she opined that Plaintiff could carry out simple instructions, and noted that, despite distracted concentration, Plaintiff had good pace and adequate persistence.  *Id.* Dr. Moody diagnosed Plaintiff with recurrent major depressive disorder with psychotic

features, panic disorder with agoraphobia, and generalized anxiety disorder, and assigned him a GAF score of 59. Tr. at 338–39.

On May 27, 2010, state agency medical consultant Gary E. Calhoun, PhD., reviewed the evidence of record and opined that Plaintiff had major depressive disorder with psychotic features, anxiety/panic disorder with agoraphobia, and adjustment disorder with depressed mood. Tr. at 341–48. He opined that Plaintiff had mild restriction of activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 351. Dr. Calhoun opined that Plaintiff could understand and remember simple instructions; could carry out simple tasks and instructions for two hours at a time; would perform best in situations that do not require on-going interaction with the public; and was able to be aware of normal hazards and take appropriate precautions. Tr. at 369–71. He further opined that Plaintiff's impairments did not preclude him from performing simple, repetitive work tasks in a setting that does not require on-going interaction with the public. Tr. at 371.

On June 3, 2010, state agency medical consultant Frank Ferrell reviewed the evidence of record and opined that Plaintiff could lift or carry up to 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk about six hours each in an eight-hour day; could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, and occasionally climb ladders, ropes and scaffolds; and must avoid even moderate exposure to hazards such as unprotected heights or dangerous machinery. Tr. at 374–81.

On July 1, 2010, Plaintiff presented to the Oconee Medical Center emergency department complaining of pain in his right shoulder and arm after a verbal altercation with a neighbor.  Tr. at 413.  He asked to have his blood sugar checked and reported that he was a borderline diabetic.  *Id.*  On examination, Plaintiff was in no acute distress and did not have an altered mental status, but was noted to have an odd affect.  Tr. at 413–14.  He was discharged with diagnoses of resolved hypertension, stress reaction, and paresthesia in his feet.  Tr. at 415.

From December 17, 2010, through December 22, 2010, Plaintiff was hospitalized with criteria for admission listed as "[p]otentially dangerous to self, others or property and in need of a controlled environment."  Tr. at 466.  He exhibited no symptoms of mania or psychosis and expressed concern about writing fraudulent checks.  *Id.*  He was discharged in stable condition and advised to follow up with the Anderson Mental Health Center.  Tr. at 467.  His discharge diagnosis included non-specific depressive disorder, non-insulin dependent diabetes, and hypercholesterolemia.  *Id.*  Following discharge, Plaintiff received mental health treatment from the Anderson Mental Health Center.  Tr. at 471–83.  As of March 1, 2011, target symptoms for treatment included: "Anxiety, Depression, Irritability, SI/HI ideation/attempts."  Tr. at 471.  Plaintiff reported that he experienced periods of excessive anger for a day and sometimes longer.  *Id.*  He also reported difficulty sleeping at night and infrequent panic attacks.  *Id.*  He was assessed with a GAF score of 47 and started on Haldol "for mood augmentation" and Effexor.  Tr. at 472.

C.    The Administrative Proceedings

    1.    The Administrative Hearing

        a.    Plaintiff's Testimony

At the hearing on March 23, 2011, Plaintiff testified that his wife passed away in June 2009.  Tr. at 40.  He stated that he weighed 300 pounds and was 6'1" tall.  Tr. at 41. He reported having anxiety attacks, depression, high cholesterol, and high blood pressure. Tr. 48.  He stated that his elevated cholesterol and blood pressure were pretty well controlled with medication.  *Id.*  He testified that his depression resulted in him staying in bed all day for about 10 to 12 days per month.  Tr. at 49.  He said his anxiety caused him to feel like he was going to have a heart attack about 10 or 15 days in a month.  Tr. at 50– 51.  He stated that he had spells of anger about 10 or 15 times each month and had trouble getting along with his sister.  Tr. at 54–55.

Plaintiff testified that he was physically able to drive a car, but that his license had been suspended.  Tr. at 66.  He reported that he did household chores, such as cleaning the bathroom, washing dishes, folding laundry, vacuuming, and mopping.  Tr. at 61–62. He said he was able to cook, run errands, and take his medications himself.  Tr. at 68.  He also said he helped care for his elderly mother.  Tr. at 63.  He testified that he spent his days watching television, writing in his journal, and talking to his girlfriend.  Tr. at 65, 67, 70.  He said he went to the flea market once a week and walked around for an hour or two.  Tr. at 71–72.  He stated he also went to church once a week.  Tr. at 65.

b.      Vocational Expert Testimony

Vocational Expert ("VE") G. Roy Sumpter reviewed the record and testified at the hearing.  Tr. at 73.  The VE categorized Plaintiff's PRW as a stocker as unskilled, medium work.  Tr. at 74.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform the exertional demands of medium work; occasionally climb ladders, ropes, or scaffolds; and frequently perform all other postural activities.  Tr. at 74.  The ALJ also noted the hypothetical individual should avoid even moderate exposure to hazards such as unprotected heights or dangerous machinery; could perform simple, routine, and repetitive tasks at level three reasoning in the *Dictionary of Occupational Titles* ("*DOT*") for two-hour periods in an eight-hour day; could concentrate, persist, and work at pace; could interact occasionally with the public; and could interact appropriately with co-workers and supervisors in a stable, routine setting.  Tr. at 74–75.  The VE testified that the hypothetical individual could perform Plaintiff's PRW as a stocker.  Tr. at 75.  The VE stated that the postural limitations would not prevent the hypothetical individual from working as a stocker because the supplies could be on a hand cart.  *Id.*

2.      The ALJ's Findings

In his decision dated April 27, 2011, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.
2.      The claimant has not engaged in substantial gainful activity since December 31, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: anxiety; depression; panic disorder; obesity; and history of syncopal episodes (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). Specifically, I find the claimant is able to lift or carry up to 50 pounds occasionally and 25 pounds frequently. I find that he can sit, stand, or walk up to six hours each in an eight-hour workday. I find he can frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl but he can only occasionally climb ladders, ropes, and scaffolds. He must avoid moderate exposure to hazards such as unprotected heights or dangerous machinery. Additionally, I find he is capable of concentrating, persisting and working at pace to do simple, routine, and repetitive tasks at level three reasoning per the Dictionary of Occupational Titles for two-hour periods in eight-hour workday. Further, I find he is limited to only occasional interaction with the public. However, he is able to interact appropriately with supervisors and co-workers in this type of stable, routine setting.

6.     The claimant is capable of performing past relevant work as a stocker. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2001, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 10–18.

II.     Discussion

Plaintiff filed his complaint and brief pro se. In his complaint, he states that he disagrees with the unfavorable decision of his claim. [Entry #1 at 3]. In his brief, he does not identify any errors in the ALJ's decision and states that he needs disability income because he has "no way to pass [a] physical drug test for a job." [Entry #29 at 1].

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii),

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520, 416.920.   These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.   20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b), Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

---

416.920(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at

13

1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*,

483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

Plaintiff has not noted any specific objections to or error in the ALJ's decision.

However, because Plaintiff is proceeding pro se, the court is charged with liberally

construing Plaintiff's brief to allow for the development of a potentially meritorious

claim. *See Boag v. MacDougall*, 454 U.S. 364, 365 (1982); *see also Barnett v. Hargett*,

174 F.3d 1128, 1133 (10th Cir. 1999) (stating that the mandated liberal construction of

pro se pleadings means only that if the court can reasonably read the pleadings to state a

valid claim on which the plaintiff could prevail, it should do so). Accordingly, the

undersigned construes Plaintiff's brief as challenging whether the ALJ's decision is

supported by substantial evidence. For the reasons set forth below, the undersigned

recommends a finding that the decision is supported by substantial evidence.

    1.    Steps One and Two

In determining that Plaintiff was not disabled, the ALJ properly followed the five-

step sequential evaluation process for evaluating disability claims. *See* 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4) (outlining the sequential evaluation process). At the first

step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his

alleged onset date, December 31, 2001. Tr. at 10.

At step two, the ALJ found that Plaintiff had severe impairments of anxiety, depression, panic disorder, obesity, and history of syncopal episodes. Tr. at 11. The ALJ also considered Plaintiff's alleged diabetes mellitus and hypertension, but reasonably found they were non-severe impairments. Tr. at 12. The ALJ noted that the record indicates Plaintiff received treatment for diabetes and hypertension but, other than that, there are few mentions of these diagnoses in the record. Tr. at 12. The ALJ further noted that Plaintiff's diabetes did not require insulin and Plaintiff did not even mention diabetes as one of his impairments at the hearing. *Id.* In his brief, Plaintiff alleges that he is a diabetic and has to "take insulin twice a day." [Entry #29 at 1]. However, there is no medical evidence of record demonstrating that Plaintiff took insulin during the period relevant to the ALJ's decision. Furthermore, Plaintiff has not alleged that his diabetes resulted in any functional limitations and there is no documentation of related functional limitations in the record. With regard to Plaintiff's hypertension, he testified that as long as he took his medication, his blood pressure was controlled. Tr. at 48. For these reasons, the undersigned recommends a finding that the ALJ's conclusion that Plaintiff's diabetes and hypertension were non-severe impairments is supported by substantial evidence.

The ALJ also discussed Plaintiff's alleged multiple sclerosis at step two, but noted that there was no medical evidence in the file to substantiate this alleged diagnosis. Tr. at 12. The ALJ stated that notes from Plaintiff's treating physicians do not mention multiple sclerosis, and there are no neurologic records. *Id.* The ALJ accordingly determined that Plaintiff's alleged multiple sclerosis was a non-medically determinable

impairment. *Id.* Similarly, Plaintiff alleged having seizures, but the ALJ noted that the record failed to show that he had been diagnosed with seizures. *Id.* The ALJ acknowledged that Plaintiff experienced two documented syncope episodes and that one doctor noted that it might have been some type of seizure event, but that a CT of Plaintiff's head was unremarkable, and an EEG panel was negative for epileptiform discharges. Tr. at 12; *see also* 264, 266, 268, 280. Furthermore, the ALJ noted that on the EEG panel, Plaintiff's bilateral temporal muscle artifact was found to be consistent with anxiety. Tr. at 12; *see also* 280. The ALJ then concluded that Plaintiff's seizures were also a non-medically determinable impairment. Tr. at 12. Because the ALJ provided specific reasons for finding Plaintiff's alleged impairments of multiple sclerosis and seizures were not medically determinable impairments, and there is no contradictory evidence in the record, the undersigned recommends a finding that the ALJ's decision on these issues is supported by substantial evidence.

Based on the foregoing, the undersigned recommends a finding that the ALJ did not err at steps one or two of the sequential evaluation.

2.    Step Three

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. Tr. at 12. The ALJ considered Plaintiff's mental impairments and obesity, and specifically compared Plaintiff's impairments to listings 12.04, 12.06, and 12.08. Tr. at 12–13.

In finding that Plaintiff's mental impairments did not meet or equal a listing, the ALJ noted that Plaintiff had only mild restriction of ADLs, moderate restriction in social functioning, moderate restriction with concentration, persistence and pace, and no episodes of decompensation of extended duration. Tr. at 13. The ALJ provided sound reasons for his findings in each of these areas. With regard to Plaintiff's ADLs, the ALJ noted that Plaintiff did household chores, cared for his personal needs, watched television, wrote in a journal, talked to his girlfriend, and walked around a flea market for an hour or two once a week. *Id.* With regard to social functioning, the ALJ noted that Plaintiff reported some difficulty getting along with family members, but talked to his family on the phone every day, attended church twice a week, went grocery shopping once a month, lived with his mother and father, and had a girlfriend. *Id.* With regard to concentration, persistence, or pace, the ALJ cited to Dr. Moody's report, which noted Plaintiff's concentration was slightly distracted and he had difficult with delayed recall, serial 7s, and spelling the word "world" backwards. *Id.* However, the report also noted that Plaintiff's memory was intact, his pace was good, and his persistence was adequate. *Id.*

The ALJ then addressed his finding that Plaintiff had no episodes of decompensation. *Id.* The ALJ acknowledged that Plaintiff had been hospitalized for mental conditions three times since his alleged onset date. *Id.* The ALJ noted, however, that according to 12.00C4, the term "repeated episodes of decompensation, each of extended duration" means three episodes within one year, or an average of every four months, each lasting for at least two weeks. *Id.* The regulation further provides that if a

claimant has experienced more frequent episodes of a shorter duration or less frequent episodes of a longer duration, the ALJ may use his judgment to determine if the duration or functional effects of the episodes may be used to substitute for a listed finding in a determination of equivalence. *Id.* Because none of Plaintiff's three hospitalizations lasted for longer than a week, the ALJ found that Plaintiff had experienced no episodes of decompensation. *Id.*

The ALJ explained his listing analysis in detail and provided specific reasons for his findings. Furthermore, there is no evidence in the record contrary to the ALJ's findings. For these reasons, the undersigned recommends a finding that the ALJ's step three findings are supported by substantial evidence.

### 3.    RFC Determination

Because the ALJ concluded that Plaintiff's impairments did not meet or equal any listed impairments, he went on to assess Plaintiff's residual functional capacity ("RFC"). The ALJ determined that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) with some additional limitations. Tr. at 14. Specifically, the ALJ found that Plaintiff could lift or carry up to 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk up to six hours each in an eight-hour day; could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; could occasionally climb ladders, ropes, and scaffolds; must avoid even moderate exposure to hazards such as unprotected heights or dangerous machinery; could concentrate, persist, and work at pace to do simple, routine, and repetitive tasks at level three reasoning per the *DOT* for two-hour periods in an eight-hour day; could interact

with the public occasionally; and could interact appropriately with supervisors and co-workers in a stable, routine setting.  Tr. at 14.

It is the ALJ's responsibility to determine a claimant's RFC.  20 C.F.R. §§ 404.1527(e), 404.1546, 416.927(e)(2), 416.946.  Here, in determining Plaintiff's RFC, the ALJ considered the evidence of record, Plaintiff's subjective complaints, the findings of Plaintiff's treating and examining physicians, and the opinions of the state agency medical consultants.

First, the ALJ considered Plaintiff's subjective complaints of limitation and concluded that Plaintiff's statements about the impact of his impairments were not entirely credible.  Tr. at 14–17.  The ALJ found that Plaintiff's symptoms and allegations were not substantiated by the evidence of record.  Tr. at 15.  For example, although Plaintiff testified that he spent approximately 10 to 12 days per month in bed because of his depression, his treatment notes made no mention of him ever staying in bed all day. *Id.*  The ALJ noted that Plaintiff's allegation of multiple sclerosis was not supported by any diagnosis in the record.  *Id.*  In addition, although he claimed that he had an upcoming appointment regarding his alleged multiple sclerosis with his family practitioner, the doctor's office told the state agency medical examiner that Plaintiff did not have any upcoming or scheduled appointment. *Id.*  Because the ALJ set forth specific reasons for discounting Plaintiff's credibility in accordance with SSR 96-7p, the undersigned recommends a finding that the credibility assessment is supported by substantial evidence.

Next, the ALJ provided a narrative discussion of Plaintiff's limitations in accordance with SSR 96-8p. A review of the ALJ's decision reveals that he discussed each of Plaintiff's credible impairments and the related medical evidence over time. Tr. at 15–16. He then explained how he accounted for the limitations related to those impairments in his RFC assessment. Tr. at 16. The undersigned recommends a finding that the ALJ's narrative discussion of Plaintiff's impairments satisfies the requirements of SSR 96-8p. *See Spicer v. Colvin*, C/A No. 3:12-460, 2013 WL 3929824 (D.S.C. July 29, 2013) (finding narrative discussion sufficient to support RFC determination where the ALJ discussed the medical evidence and cited evidence contradicting Plaintiff's alleged limitations).

Finally, the ALJ addressed the opinion evidence in the record. He accorded little weight to Dr. Booker's opinion that Plaintiff's mental impairments caused serious work-related limitations. Tr. at 16. In doing so, the ALJ noted that because Dr. Booker is a family practitioner, his opinion rests, at least in part, on an assessment of an impairment outside his area of expertise. Tr. at 17. The ALJ also noted that Dr. Booker rendered his opinion prior to Plaintiff's later hospitalizations and his treatment at Anderson Mental Health Center. *Id.* The ALJ found that the opinion could not be applied to describe Plaintiff's condition over the year prior to the decision and was too remote in time to be given great weight. *Id.* The undersigned does not find the explanation afforded by the ALJ regarding discounting Dr. Booker's opinion to be the "persuasive contrary evidence" necessary for an ALJ to give less weight to the opinion of a treating physician. *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). However, the undersigned's review of the

record demonstrates that Dr. Booker's opinion is not supported by the medical evidence of record.  Thus, the undersigned recommends a finding that the ALJ's failure to adequately explain his reasons for discounting Dr. Booker's opinion was harmless error. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

After discounting Dr. Booker's opinion, the ALJ accorded great weight to the opinion of Dr. Moody because she completed a personal examination of Plaintiff and her findings were consistent with the record as a whole.  Tr. at 17.  The undersigned finds no error in the ALJ's decision to accord Dr. Moody's opinion great weight.

Finally, the ALJ summarized his RFC assessment by noting that it was consistent with the opinions of Dr. Moody and the state agency medical consultants, the lack of clinical and objective findings in the record to substantiate Plaintiff's allegations, and Plaintiff's own testimony regarding his social capabilities and his ability to perform simple tasks.  Tr. at 17.

Based on the foregoing, the undersigned recommends a finding that the ALJ's RFC assessment is supported by substantial evidence.

4.    Step Four

Based on his RFC finding, the ALJ determined at step four that Plaintiff could return to his PRW as a stocker because that work did not require the performance of activities precluded by Plaintiff's RFC.  Tr. at 17.  At the hearing, the VE described Plaintiff's PRW as a stocker as medium, unskilled work.  Tr. at 74.  Considering a

hypothetical individual with Plaintiff's RFC, the VE testified that the individual would be able to perform the job of stocker.  Tr. at 75.  He explained that the limitations presented in the hypothetical would not prevent the performance of the job because the individual could use a handcart to transport materials.  *Id.*  Based on the VE's testimony that the Plaintiff could return to his PRW, the ALJ found Plaintiff was not disabled.  Tr. at 18. Because the VE's testimony was grounded in the RFC determination that the undersigned has already concluded is supported by substantial evidence, the undersigned likewise recommends that the ALJ's step four finding is supported by substantial evidence.  In light of the finding that Plaintiff could return to his PRW, it was not necessary for the ALJ to proceed to step five of the sequential analysis.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 13, 2014                                        Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).